THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| AION ACQUISITION LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 19 C 4342 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| DEXTER AXLE COMPANY, LLC, | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Dexter Axle Company, LLC, a trailer axle and brake manufacturer, placed a large order of parts from Factory Direct Logistics, LLC. After extending the delivery deadline twice, Dexter cancelled the contract and refused delivery of late shipments. Plaintiff Aion Acquisition LLC, who now stands in FDL's shoes, brings claims of breach of contract, unjust enrichment, and promissory estoppel. Aion alleges that Dexter never paid for timely delivered parts and refused the late shipments without cause. Aion moves for partial summary judgment with respect to the timely delivered parts. (Dkt. 103). Dexter cross-moves for summary judgment on all counts. (Dkt. 107). For the reasons below, Aion's partial motion is granted, and Dexter's motion is granted in part and denied in part.

## <u>BACKGROUND</u>

Defendant Dexter Axle Company manufactured trailer axles and brakes. (Dkt. 111 ¶ 6). Factory Direct Logistics, LLC (FDL) was a non-party supplier of commercial industrial fasteners and axle component parts. (*Id.* at ¶ 7; Dkt. 114 ¶ 7). P2Binvestor, Inc., the original plaintiff, provided capital to small and mid-sized businesses, like FDL, by purchasing receivables. (Dkt.

111 ¶ 5). Plaintiff Aion Acquisition LLC has acquired the assets of P2Binvestor's holding company. (*Id.* at ¶ 37).

## A.    Dealings Between Dexter and FDL

In September 2015, Dexter and FDL agreed to Purchase Order 34004, providing for Dexter's purchase of products from FDL over two years. (Dkt. 114 ¶ 8). Every six months during those two years, Dexter sent FDL performance evaluations, which assessed FDL's product quality, delivery, and support, resulting in an overall score of "excellent, good, marginal, or probationary." (*Id.* at ¶ 9; Dkt. 102-4 at 2–5). Three of Dexter's evaluations gave FDL a score of "probationary," and the fourth gave FDL a score of "marginal." (Dkt. 114 ¶ 9; Dkt. 102-4 at 2–5).

On September 28, 2017, Dexter's commodity manager, Michael Broadstreet, who oversaw the FDL account, sent a letter to FDL's president Dan Long explaining that Dexter would not extend Purchase Order 34004 for reasons including "stock outages, quality issues, and [a] price increase." (Dkt. 111 ¶ 53; Dkt. 114 ¶ 10; Dkt. 102-4 at 7). Long acknowledged the letter a few days later. (Dkt. 114 ¶ 10; Dkt. 102-4 at 9–13). Dexter and FDL then agreed to a final purchase order to "wind down" their relationship. (Dkt. 114 ¶ 11, 27).

Around March 19, 2018, FDL sold and assigned its accounts receivable regarding Dexter to P2Binvestor. (Dkt. 111 ¶¶ 23–25). Dexter acknowledged the assignment by making several payments to P2Binvestor. (*Id.* at ¶¶ 26, 46).

## B.    Purchase Order 36641

On May 29, 2018, Broadstreet emailed Purchase Order 36641—the wind-down order—and an addendum to Long. (*Id.* at ¶ 53; Dkt. 121 ¶ 1; Dkt. 112-1). Purchase Order 36641 listed parts, including fasteners, bolts, and lock nuts, that Dexter planned to buy from FDL. (Dkt. 111 ¶ 8; Dkt. 112-1). The purchase order required FDL to keep the listed parts in stock so that Dexter

could request their shipment. (Dkt. 111 ¶ 16; Dkt. 101-1 at 38). Through subsequent emails, FDL and Dexter agreed that the purchase order reflected their agreement. (Dkt. 121 ¶ 3). The parties dispute whether FDL accepted the terms of the addendum, which it did not sign. (Dkt. 114 ¶¶ 14, 16; Dkt. 119 ¶ 2). Both the purchase order and the addendum included choice-of-law provisions specifying that Indiana law should govern. (Dkt. 111 ¶ 19).

After accepting a purchase order, FDL typically created a sales order establishing the quantities and prices of the products in the accepted purchase order. (Dkt. 114 ¶ 22). In an affidavit, Long stated that FDL sent Sales Order 14154 to Dexter based on Purchase Order 36641 around May 30, 2018. (Dkt. 111 ¶ 14; Dkt. 101-1 at 38; Dkt. 114 ¶ 23; Dkt. 102-8 at 51–61). Sales Order 14154 stated: "Delivery is an estimate and product can be ready either sooner or later than the date on this sales confirmation." (Dkt. 102-8 at 60). Broadstreet testified that he was generally familiar with sales orders, (Dkt. 119 ¶ 7; Dkt. 115-3 at 12), but he had never seen Sales Order 14154. (Dkt. 111 ¶¶ 13–14; Dkt. 112-6 at 39–40; Dkt. 121 ¶ 4).

### 1. Payment

On payment, Purchase Order 36641's terms and conditions stated: "Unless the purchase order states otherwise, (a) Buyer [Dexter] agrees to pay for the Goods within 60 days of the end of the calendar month in which a correct and valid invoice for the Goods is received by Buyer . . . ." (Dkt. 111 ¶ 9; Dkt. 101-1 at 21). "Goods" included "goods, materials, tooling, supplies, services and/or work as described in the purchase order." (Dkt. 111 ¶ 10; Dkt. 101-1 at 21).

### 2. Cancellation and Breach

On cancellation, the terms and conditions of Purchase Order 36641 stated:

Buyer reserves the right to cancel all or any part of a purchase order without payment or further liability if: Seller breaches any of the terms of this Agreement; Seller does not make deliveries as specified in the schedules; or, in Buyer's

3

reasonable discretion it determines that delivery in accordance with the delivery schedules is endangered.

(Dkt. 114 ¶ 17; Dkt. 102-8 at 42; *see also* Dkt. 102-6 at 6–23 (providing a delivery date of July 31, 2018)).[1] The terms and conditions also stated: "In no event will Buyer's liability for any breach, alleged breach, or cancellation of this Agreement exceed the total price shown on the applicable purchase order, nor will Buyer be liable for any incidental or consequential damages resulting from any such breach, alleged breach, or cancellation." (Dkt. 114 ¶ 21; Dkt. 102-8 at 43).

### 3. Delivery Deadline

On the time for delivery, the terms and conditions of Purchase Order 36641 stated:

Deliveries must be made in the quantities and at the time specified on the purchase order . . . . Time is of the essence for Seller's performance of all of its obligations under this Agreement. If at any time Seller has reason to believe that deliveries will not be made as scheduled, Seller will immediately notify Buyer of the cause and duration of the anticipated delay.

(Dkt. 114 ¶ 20; Dkt. 102-8 at 42). Initially, the delivery date was July 31, 2018. (Dkt. 114 ¶ 30). Discussing the purchase order through email, Long expressed concerns about the feasibility of the July 31 deadline. (*Id.* at ¶ 13; Dkt. 102-6). Broadstreet responded that Dexter needed the parts by July 31 and then requested that FDL "[p]lease get as much here by July 31st, as possible." (Dkt. 114 ¶ 13; Dkt. 102-6 at 2). Broadstreet "made clear that time was of the essence." (Dkt. 114 ¶ 33). On May 30, 2018, Long replied that FDL would "start working on this immediately." (Dkt. 121 ¶ 2; Dkt. 112-2 at 1).

On May 31, 2018, Long requested a 60-day extension to the July 31 deadline, making the deadline September 29, 2018. (Dkt. 114 ¶¶ 32–33). Broadstreet stated on September 12, 2018 that

---

[1] The addendum also had a termination clause. (Dkt. 114 ¶ 17; Dkt. 102-6 at 3–4 ("If the shipping of any or all of the Parts by Fastener is not completed as specified herein on or before July 31, 2018, Dexter reserves the right to cancel all or any part of the Purchase Order without payment or further liability. Dexter shall provide written notice of any cancellation of all or any part of the Purchase Order not yet delivered and such Purchase Order shall be immediately cancelled upon receipt of such written notice.")).

"[t]hese invoices are the last ones [Dexter's supplier] Bossard has authority to receive as they should be done by September/Beginning of October." (*Id.* at ¶ 35; Dkt. 102-8 at 23). On September 14, 2018, Broadstreet agreed to further extend the delivery date and invoked the cancellation provision, saying: "We were supposed to be done with this in July. Everything not shipped to our facility or Bossard's facility by October 31, 2018 will be considered cancelled." (Dkt. 114 ¶ 36; Dkt. 102-8 at 19; Dkt. 111 ¶ 54; Dkt. 105-6 at 12–13). Dexter refused delivery of any products that may have arrived after October 31, 2018. (Dkt. 114 ¶ 37; Dkt. 121 ¶ 23).

### 4. Shipping Instructions

Purchase Order 36641's terms and conditions and the addendum both gave Dexter discretion with respect to the shipping destination. (Dkt. 114 ¶ 18; Dkt. 102-8 at 42; Dkt. 102-6 at 3). The place of delivery was Dexter's supplier, Bossard, in Chicago, except for: (1) products to be delivered to Dexter's plants; and (2) "unfinished products to be scrapped overseas." (Dkt. 114 ¶ 29). "Release" purchase orders specified the shipment location for specific parts from the total list of parts under the "original master [Purchase Order] 36641." (*Id.* at ¶ 40). On May 29, 2018, Broadstreet sent a purchase order directing FDL to scrap certain products. (*Id.* at ¶ 29; Dkt. 102-9 at 11–16). Two months later, on July 31, 2018, Broadstreet sent two release purchase orders— numbers 116198 and 231226—directing FDL to ship part 007-003-00 to Dexter's plants in Indiana and Oklahoma. (Dkt. 114 ¶ 39).

Long testified that Broadstreet did not give FDL authority to ship or provide the disposition of "a large group" of products "until well after July 31st." (Dkt. 119 ¶¶ 15, 19; 115-1 at 65, 69). On August 27, 2018, Broadstreet reminded Long and others at FDL that he had by then issued release purchase orders directing parts to be shipped to Dexter's plants or Bossard or to be scrapped. (Dkt. 114 ¶ 42; Dkt. 102-8 at 8). The next day, Long asked Broadstreet where to ship

part 007-003-00. (Dkt. 114 ¶ 43; Dkt. 102-8 at 7). Broadstreet replied on September 6, 2018 that he had already given FDL "the [release purchase orders] for direct shipments to the plants." (Dkt. 114 ¶ 44; Dkt. 102-8 at 6). The same day, Long asked Broadstreet again where to ship part 007-003-00. (Dkt. 114 ¶ 45; Dkt. 102-8 at 5). A day later, on September 7, 2018, Broadstreet replied that release purchase orders 116198 and 231226 directed the shipment of part 007-003-00 to Dexter's Indiana and Oklahoma plants. (Dkt. 114 ¶ 46; Dkt. 102-8 at 5).

On September 12, Long asked Broadstreet to "provide disposition of" part 007-003-00. (Dkt. 114 ¶ 47; Dkt. 102-8 at 24–25). Broadstreet replied on the same day, repeating that the part should be shipped to the Indiana and Oklahoma plants pursuant to release purchase orders 116198 and 231226. (Dkt. 114 ¶ 48; Dkt. 102-8 at 23). Two days later, Broadstreet repeated the instructions for shipment of part 007-003-00. (Dkt. 114 ¶ 49; Dkt. 102-8 at 22). Broadstreet also reminded Long that other products should be shipped to Bossard by July 2018. (Dkt. 114 ¶ 67; Dkt. 102-8 at 19). On September 20, 2018, Long confirmed that part 007-003-00 would be shipped to Dexter's Indiana and Oklahoma plants. (Dkt. 114 ¶ 50; Dkt. 102-8 at 17–18).

FDL account manager Rachel Borgman testified that Broadstreet needed to provide direction on all inventory. (Dkt. 119 ¶ 22). "[P]art of the struggle of maintaining [the Dexter] account," Borgman said, "was that there was not clear direction." (*Id.* at ¶ 23; Dkt. 115-5 at 19). She testified further that FDL received "conflicting direction from [Broadstreet] on how he wanted to proceed with certain items." (Dkt. 119 ¶ 23; Dkt. 115-5 at 19). Borgman explained that Broadstreet "wanted to make part-by-part decisions" to save on unnecessary material and shipment costs. (Dkt. 119 ¶ 23; Dkt. 115-5 at 26). The majority of FDL's delays in shipping to Dexter, according to Borgman, "were due to not receiving direction from [Broadstreet]," and there was "a lot of back and forth with what [Broadstreet] wanted his final disposition to be. So he made certain

decisions on items and then a week later changed his mind," which "was not uncommon through this entire process." (Dkt. 119 ¶ 24; Dkt. 115-5 at 29, 34). Borgman also attributed delays to production lead times and moving containers from overseas, which were beyond FDL's control. (Dkt. 119 ¶ 25; Dkt. 115-5 at 30).

Long testified that tariffs caused additional delays. (Dkt. 119 ¶ 26; Dkt. 115-1 at 8, 82).[2] But FDL never mentioned to Dexter that tariffs were causing delays. (*See* Dkt. 119 ¶ 26). Rather, in an email on November 15, 2018, Long told Broadstreet that FDL "got the parts here in less than 45 days from your final approval, which is lightning fast"—without blaming any delays on tariffs. (Dkt. 102-8 at 16).

### 5. Invoices and Bills of Lading

FDL created an invoice when products were ready for shipment. (Dkt. 114 ¶ 25). Long stated that FDL would not issue an invoice "until Dexter submitted a request for delivery of the Fasteners listed in the Sales Order," (Dkt. 111 ¶ 15; Dkt. 101-1 at 38), which Dexter disputes. (Dkt. 111 ¶ 15; Dkt. 121 ¶¶ 7–8, 13–20). When a product came from overseas, along with the invoice, FDL included a bill of lading and packaging slip upon shipment. (Dkt. 114 ¶ 26). The bill of lading served as proof of the products' shipment and delivery. (*Id.*).

### 6. Purchase Amount

Long stated that Dexter ordered $641,787.24 worth of fasteners from FDL, pointing to twelve invoices totaling that amount. (Dkt. 111 ¶ 18; Dkt. 101-1 at 38, 69–92). Around October 2018, according to Long's affidavit and deposition testimony, Dexter accepted—but did not pay for—a shipment of fasteners from FDL worth $114,935.81. (Dkt. 111 ¶ 19; Dkt. 101-1 at 38, 89–

---

[2] Dexter responds that FDL vice president of operations Pok Norasith gave conflicting testimony that tariffs did not cause delays. (Dkt. 119 ¶ 26). But Dexter has not produced the pages of Norasith's deposition to which it cites. From the Court's review, the testimony that Dexter references does not appear in any excerpts of Norasith's testimony on the record. (*Compare id.* at ¶ 26, *with* Dkt. 102-8 at 46–49, *and* Dkts. 112-11, 115-4).

92; Dkt. 119 ¶ 37; Dkt. 115-1 at 97–98).[3] Long testified that he spoke with Dexter's vice president of procurement Chris Risdon about the delivery and Dexter's failure to pay. (Dkt. 119 ¶ 37; Dkt. 115-1 at 98–99). Risdon told Long "we're just not paying you." (Dkt. 119 ¶ 37; Dkt. 115-1 at 99). Long stated that the shipments Dexter refused after October 31, 2018 totaled $526,851.43. (Dkt. 111 ¶ 20; Dkt. 101-1 at 38; *see also* Dkt. 121 ¶ 23).

## C. Procedural History

After FDL filed for bankruptcy, a bankruptcy court entered an order on April 25, 2019, permitting P2Binvestor to pursue litigation against Dexter to collect FDL's accounts receivable. (Dkt. 111 ¶¶ 31–33); Dkt. 101-2 at 32–39). When P2Binvestor filed the original complaint on June 27, 2019—bringing only state-law claims and invoking the Court's diversity jurisdiction—there was complete diversity of citizenship: P2Binvestor was a citizen of Colorado, and Dexter was a citizen of Delaware and Indiana. (Dkt. 1 ¶¶ 1–2).[4] [5] In November 2019, P2Bi Holdings LLC acquired P2Binvestor's assets. (Dkt. 101 ¶ 40; Dkt. 111 ¶ 36).[6] Then, Aion acquired P2Bi Holdings in May 2021, including FDL's claim against Dexter. (Dkt. 101 ¶ 41; Dkt. 111 ¶¶ 37–38).

---

[3] Dexter argues that Aion "fails to cite to any evidentiary material that Dexter received, accepted and never paid for" the fasteners. (Dkt. 111 ¶ 19). Yet, Aion has pointed to Long's affidavit and deposition testimony stating that Dexter accepted and never paid for the parts. (Dkt. 101-1 at 38; Dkt. 115-1 at 97–98). Aion has also produced two invoices corresponding with Purchase Order 36641 dated July 13 and 18, 2018 which total $114,935.81. (Dkt. 101-1 at 89–92). Dexter has not produced any contradictory evidence. Aion has pointed further to a pile of bills of lading as evidence of the delivery. (Dkt. 120 at 5–6 (citing Dkts. 115-6; 121-1, 121-2)). Yet, from the Court's review, it appears that the relevant bills of lading—reflecting the delivery of four shipments on October 1 and 2, 2018—only appear as exhibits to Aion's response to Dexter's statement of additional facts supporting its motion. (Dkt 121-1 at 51–52, 57–58; Dkt. 122-2). These relevant bills of lading are not among the 47 pages of bills of lading that Aion produced with its statement of additional facts, (Dkt. 115-6), to which Dexter has responded. (Dkt. 119 ¶ 38). Since Dexter has had no opportunity to respond to the relevant bills of lading, the Court does not consider them. *See Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*, 950 F.3d 959, 969 (7th Cir. 2020 ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." (citation omitted)).

[4] At all times, the amount in controversy has exceeded $75,000. (*Id.* at ¶ 44).

[5] Dexter brought a Counterclaim on September 30, 2019, (Dkt. 14), which the Court dismissed on March 25, 2020 (Dkt. 43).

[6] P2Binvestor continued to operate under the same name, and P2Bi Holdings never became a party to the litigation. (Dkt. 90 ¶ 1 n.1; *see also* Dkt. 80 (July 21, 2021, First Amended Complaint, naming P2Binvestor as the plaintiff)).

On November 24, 2021, P2Binvestor moved under Rule 15 for leave to file a second amended complaint, to "substitute" Aion as the plaintiff. (Dkt. 90). Although the motion repeatedly used language of substitution, it did not expressly invoke Rule 25, which governs the substitution of parties. (*Id.*); *see* Fed. R. Civ. P. 25. Dexter consented to the amendment. (Dkt. 92). By the time Aion filed the Second Amended Complaint on April 7, 2022, naming Aion as the plaintiff, both parties were LLCs. (Dkt. 101).[7] The Second Amended Complaint brought the same state-law claims as the original complaint and invoked the Court's diversity jurisdiction. (Dkt. 101). Aion's claims are for breach of contract (Count I); promissory estoppel (Count II); and unjust enrichment (Count III). (*Id.* at ¶¶ 43–66).

The same day Aion filed the Second Amended Complaint, it moved for partial summary judgment on its breach-of-contract claim, or in the alternative, on its unjust enrichment claim, for $114,935.81. (Dkt. 103). The next day, on April 8, 2022, Dexter cross-moved for summary judgment on all counts. (Dkt. 107).

On February 16, 2023, the Court ordered the parties to submit amended jurisdictional statements because the parties had not provided the citizenship of their members. (Dkt. 123). The parties' amended jurisdictional statements showed that the parties were no longer diverse when Aion filed the Second Amended Complaint. (*See* Dkts. 124, 125). Both parties' sole members are Delaware corporations. (Dkts. 124, 125) On February 28, 2023, the Court directed the parties to submit supplemental briefing on whether the Second Amended Complaint defeated subject-matter jurisdiction by destroying complete diversity. (Dkt. 126). Aion filed a brief arguing that the Court's jurisdiction remains intact. (Dkt. 127). Dexter did not submit a supplemental brief.

---

[7] Dexter converted into an LLC on August 1, 2021. (Dkt. 102-1 ¶ 1 & n.1).

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there is "sufficient evidence" for a jury to return a verdict in favor of the party opposing summary judgment. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). On cross-motions for summary judgment, the Court "construe[s] all facts and inferences in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 943 F.3d 1012, 1016 (7th Cir. 2020). "The non-movant must, however, present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

**DISCUSSION**

## I.    Subject-Matter Jurisdiction

Federal courts have limited jurisdiction. *Qin v. Deslongchamps*, 31 F.4th 576, 582 (7th Cir. 2022). Although Dexter has not challenged subject-matter jurisdiction, the Court has an "independent obligation to determine that jurisdictional requirements are satisfied." *Ware v. Best Buy Stores*, 6 F.4th 726, 731 (7th Cir. 2021); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action."). Aion, as the party seeking a federal forum, bears the burden of establishing that jurisdiction is proper. *Ware*, 6 F.4th at 731. Diversity jurisdiction under Section 1332 requires complete diversity of citizenship

and an amount in controversy over $75,000. 28 U.S.C. § 1332. "The policy of the statute calls for its strict construction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 377 (1978) (quotation omitted). For purposes of diversity jurisdiction, an LLC has the citizenship of its members. *Qin*, 31 F.4th at 579.

Diversity jurisdiction generally "depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Glob. Grp.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)); *see* Fed. R. Civ. P. 3.[8] "[T]he time-of-filing rule is what it is precisely because the facts determining jurisdiction are subject to change, and because constant litigation in response to that change would be wasteful." *Grupo*, 541 U.S. at 580; *see also Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010) (explaining that the time-of-filing rule avoids "shunt[ing cases] between court systems" because "litigation is not ping-pong"). Accordingly, "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) (per curiam).

After the original plaintiffs in *Freeport-McMoRan, Inc. v. K N Energy, Inc.* filed suit, one plaintiff transferred its interest in the litigation to a non-diverse limited partnership "for business reasons unrelated to the . . . litigation." *Id.* at 427. The plaintiffs then moved to amend their complaint to substitute the limited partnership as a plaintiff under Federal Rule of Civil Procedure 25(c). *Id.*[9] The district court allowed the plaintiffs to add the limited partnership as an additional plaintiff without removing the original transferee plaintiff. *Freeport*, 498 U.S. at 427. Although

---

[8] *See also* 13E Charles Alan Wright et al., Federal Practice and Procedure § 3608 (3d ed. 2022) ("[A] change of parties, by addition, substitution, or elimination . . . will not divest the court of diversity jurisdiction if the nature of the action remains the same, if the court finds that no collusion is involved in the conduct of the parties, or if the change is not an obvious attempt to evade the rule of complete diversity." (footnotes omitted)).

[9] Rule 25(c) provides: "if an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."

the limited partnership's addition to the case destroyed complete diversity, the Supreme Court held that diversity jurisdiction remained proper because the limited partnership "was not an 'indispensable' party at the time the complaint was filed." *Id.* at 428; *see also, e.g.*, *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558 n.1 (7th Cir. 2001) ("[S]ince the parties were completely diverse when the action was commenced and these two entities are not indispensable parties, their subsequent addition does not deprive this court of jurisdiction."); *Burka v. Aetna Life Ins. Co.*, 87 F.3d 478, 482 (D.C. Cir. 1996) ("The only potential caveat alluded to in *Freeport-McMoRan* is that a Rule 25(c) addition of a non-diverse party may destroy diversity jurisdiction . . . if the added party was *indispensable at the time the action began*."). Indeed, the limited partnership "had no interest whatsoever in the outcome of the litigation until sometime after suit was commenced. Our cases require no more than this." *Freeport*, 498 U.S. at 428. An opposite conclusion, the Court explained, could "deter[] normal business transactions during the pendency of what might be lengthy litigation" and would be unnecessary "to accomplish the purposes of diversity jurisdiction." *Id.* at 428–29.

Yet, the time-of-filing rule is not absolute, and "it is sometimes possible for a plaintiff who sues in federal court to amend away jurisdiction." *In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 381 (7th Cir. 2010). For instance, *Freeport* left intact the Supreme Court's earlier decision in *Owen Equipment & Erection Co. v. Kroger*, which held that a plaintiff may not end-run around the complete-diversity requirement by suing a diverse defendant and then bringing a claim against a non-diverse third-party defendant in an amended complaint. *Id.* at 429 (citing *Owen Equip.*, 437 U.S. at 374, 377).

In *Estate of Alvarez v. Donaldson Co.*, the Seventh Circuit applied the *Owen Equipment* rule to an amended complaint adding 48 defendants. 213 F.3d 993, 994–95 (7th Cir. 2000).

Refusing to expand *Freeport* beyond the context of Rule 25 party substitutions, the *Alvarez* Court held that the addition of non-diverse defendants defeated subject-matter jurisdiction. *Id.* Unlike in *Freeport*, the amended complaint in *Alvarez* "was clearly an addition of parties, not a substitution," and the additional defendants were "indispensable." *Id.* at 995–96. Although the *Alvarez* plaintiff amended its complaint under Rule 15, the amendment "amounted to joinder under [Rule] 19." *Id.* The plaintiff needed "to establish diversity as part of an amended complaint just as [it] did for the original complaint." *Id.* (quotation omitted). In applying the *Owen Equipment* rule, *Alvarez* alluded to the concerns of jurisdictional gamesmanship behind the rule. *See Alvarez*, 213 F.3d at 995 ("[*Owen Equipment*] held that a plaintiff may not bypass the jurisdiction requirements by suing only the diverse defendants and waiting for them to implead the nondiverse defendants.").

Another exception to the time-of-filing rule has appeared in federal question cases where an amended complaint drops the claims supporting jurisdiction. In *Rockwell Int'l Corp. v. United States*, the Supreme Court interpreted a jurisdictional bar under the False Claims Act and stated that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." 549 U.S. 457, 473–74 & n.6 (2007); *see also Wellness Cmty.–Nat'l v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995) (holding that an amended complaint, "which dropped all federal claims," defeated diversity jurisdiction). In declining to apply the time-of-filing rule, the *Rockwell* Court explained that the rule's application would allow a relator to circumvent the statute's jurisdictional bar through gamesmanship. *Rockwell*, 549 U.S. at 473. The Court then distinguished the time-of-filing rule's application in removal cases, which "raise forum-manipulation concerns that simply do not exist when it is the *plaintiff* who chooses a federal forum and then pleads away jurisdiction through amendment." *Id.* at 474 n.6; *accord Burlington*, 606 F.3d at 381.

Notwithstanding *Alvarez*'s refusal to expand *Freeport*, the Seventh Circuit later applied *Freeport* to a Rule 24 intervention in *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018, 1025–26 (7th Cir. 2006). Specifically, the *Aurora* Court held that a Rule 24 intervention by a non-diverse intervenor—who had "no interest whatsoever in the outcome of the litigation until sometime after suit was commenced"—did not defeat supplemental jurisdiction. *Id.* at 1025 (quoting *Freeport*, 498 U.S. at 428).[10] Recognizing that the plain language of the supplemental jurisdiction statute appears to forbid a Rule 24 intervention that offends complete diversity, the Court leaned on the statute's purpose of "prevent[ing] *original* plaintiffs . . . from circumventing the requirements of diversity." *Id.* (quotation omitted). Critical to the *Aurora* decision was the absence of potential gamesmanship: where an intervenor "has no say in deciding where the suit is brought," it "cannot be gaming the system." *Id.*; *see also In re Olympic Mills Corp.*, 477 F.3d 1, 12 (1st Cir. 2007) (collecting cases, including *Aurora*, and determining that "the weight of authority holds that claims launched by necessary but dispensable, nondiverse defendant-intervenors do not defeat the original jurisdiction (diversity) that obtained at the commencement of the action.").

The Seventh Circuit has not decided whether diversity jurisdiction remains intact where, as here, a non-diverse plaintiff acquired an interest in the litigation after the original complaint's filing and replaced the original plaintiff through an amended pleading under Rule 15, rather than a Rule 25 motion. Two broad, general rules seem to point toward opposite results. *Compare Rockwell*, 549 U.S. at 474 ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine

---

[10] In pertinent part, the supplemental jurisdiction statute, 28 U.S.C. § 1367(b), states that district courts exercising diversity jurisdiction under Section 1332 "shall not have supplemental jurisdiction . . . over claims by plaintiffs . . . seeking to intervene as plaintiffs under Rule 24 . . . when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332." 28 U.S.C. § 1367(b).

jurisdiction."), *with Freeport*, 498 U.S. at 428 ("[I]f jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."). Yet, the apparent jurisdictional knot comes undone by reading these competing rules within their contexts. *See Aurora*, 442 F.3d at 1026 ("[I]t is a disservice to judges and a misunderstanding of the judicial process to wrench general language in an opinion out of context."); *see also, e.g.*, *Alvarez*, 213 F.3d at 994 (confining the rule in *Freeport* to its context: "a limited part of diversity in which there was a substitution of parties"). Underlying *Rockwell*'s decision was a concern about procedural gamesmanship—a concern which is not present here. *See Rockwell*, 549 U.S. at 473. *Rockwell* did not involve the substitution or addition of non-diverse parties in the context of diversity jurisdiction. By contrast, the circumstances driving the decision in *Freeport* are almost indistinguishable from those here. *See Freeport*, 498 U.S. at 427–28.

Certainly, *Freeport* would control if the motion for leave to file the Second Amended Complaint substituting Aion expressly invoked Rule 25. And it still controls. Despite the technical distinction, *Freeport*'s reasoning applies in full force. Like the limited partnership in *Freeport*, Aion became a party through an amended complaint. *See Freeport*, 498 U.S. at 427. Aion's Second Amended Complaint did not bring new claims, drop old ones, or otherwise alter the nature of the action. *See Wellness*, 70 F.3d at 49. Nor was Aion indispensable when this litigation began. *See Freeport*, 498 U.S. at 428. Deterring "normal business transactions," like Aion's post-filing acquisition of P2Bi Holdings' assets, would be unnecessary to advance the purposes of diversity jurisdiction. *See id.* Further, since Aion did not acquire P2Bi Holdings until almost two years after this litigation began, there is no concern that Aion is trying to game the system or "do in two steps, what if done in one, would clearly disclose the absence of federal jurisdiction." *See Merit Tat Int'l, Ltd. v. Wynnchurch Cap. Partners*, 689 F. Supp. 2d 1088, 1093 (N.D. Ill. 2010) (citing *Am. Nat'l*

*Bank & Tr. Co. of Chi. v. Bailey*, 750 F.2d 577, 583 (7th Cir. 1984)); *Aurora*, 442 F.3d at 1025.

In the absence of potential gamesmanship, this Court's jurisdiction does not hinge on Aion's substitution through Rule 15 rather than Rule 25. Decisions holding that an amended complaint adding a non-diverse party defeated diversity jurisdiction have not involved post-filing transfers of interest. *See, e.g.*, *Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., LP*, 362 F.3d 136, 140–41 (1st Cir. 2004) ("In contrast to *Freeport-McMoRan*, there was no post-filing transfer of interest in the instant case."); *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 861–62 (11th Cir. 1998) ("In this case, the City's addition was unrelated to rule 25. As a result, we find *Freeport* to be inapplicable.").

Just as the motion to amend in *Alvarez* "amounted to joinder," the motion here amounted to Rule 25 substitution. *See Alvarez*, 213 F.3d at 995. Aion replaced the original plaintiff following a post-filing transfer of interest without changing the nature of the action. *See* Fed. R. Civ. P. 25(c); *see also Brough v. Strathmann Supply Co.*, 358 F.2d 374, 376 (3d Cir. 1966) ("[I]t makes little difference what terminology is used. The determining factor is the effect of the change of parties plaintiff on the nature of the action. The nature of this action has remained the same and therefore diversity is to be determined as of the time of the commencement of the suit."); *accord* Wright et al., *supra*, § 3608 ("[I]f the 'substitution' is accompanied by a change in the nature of the right asserted, the existence of complete diversity must be redetermined as of the time of the change in parties."). The motion's repeated use of substitution language reflected a clear purpose to substitute Aion as the proper plaintiff. To find that the failure to expressly invoke Rule 25 defeats jurisdiction would ignore the thrust of *Freeport* and put form ahead of substance. Accordingly, diversity jurisdiction remains proper despite Aion's substitution. The Court turns next to the merits.

## II.     Breach of Contract and Unjust Enrichment (Counts I & III)

A breach-of-contract claim under Indiana law has four elements: "(1) a valid and binding contract; (2) performance by the complaining party; (3) non-performance by the defendant; and (4) damages arising from the defendant's breach." *Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*, 8 F.4th 642, 647 (7th Cir. 2021).[11] A valid contract requires an "offer, acceptance, consideration, and manifestation of mutual assent." *KR Enterprises, Inc. v. Zertec, Inc.*, 461 F. Supp. 3d 825, 837 (N.D. Ind. 2020) (quoting *Martins v. Hill*, 121 N.E.3d 1066, 1068 (Ind. Ct. App. 2019)). Under Indiana law, "[t]he unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts." *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 762 (7th Cir. 2015) (quoting *Whitaker v. Brunner*, 814 N.E.2d 288, 293 (Ind. Ct. App. 2004)). "Indiana courts prefer 'an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict." *Id.* (quoting *Four Seasons Mfg. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007)).

The parties agree that there was a valid contract and that Purchase Order 36641 and its accompanying terms and conditions were part of the bargain. The parties further agree that Aion now stands in FDL's shoes and may bring a breach-of-contract claim against Dexter. The parties' agreement ends there: Dexter claims that the contract included the addendum—and its broader cancellation provision. (Dkt. 102 at 5, 8). Aion disagrees, contending that the contract incorporated FDL's Sales Order 14154 instead, which provided that "[d]elivery is an estimate." (Dkt. 113 at 6–8; Dkt. 102-8 at 60). Deciding the parties' cross-motions for summary judgment, however, does not require resolving this dispute over the contract's terms.

---

[11] The parties agree that Indiana law governs the agreement pursuant to the choice-of-law provision in Purchase Order 36641. (Dkt. 102 at 4 n.1; Dkt. 113 at 8; Dkt. 111 ¶ 19); *see Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020) (explaining that federal courts sitting in diversity honor an agreement's choice-of-law clause, "unless to do so would be contrary to public policy").

### A.    Aion's Partial Motion

Aion claims that Dexter accepted and never paid for $114,935.81 worth of parts in October 2018, breaching Purchase Order 36641's payment provision. (Dkt. 106 at 6–7). Dexter's sole argument in response is that Aion's evidence fails to support its claim. (Dkt. 110 at 3–9). But Aion has pointed to Long's affidavit and deposition testimony that Dexter accepted and never paid for fasteners from FDL totaling $114,935.81. To the extent Dexter suggests that Long's affidavit and testimony are conclusory or unsupported by his personal knowledge, (Dkt. 110 at 5–6), the argument falls short.[12]

Under Rule 56, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge." *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 686 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(c)(4)). Dexter does not explain why FDL's president—who negotiated the contract at issue—would not have personal knowledge of FDL's delivery of fasteners to Dexter and Dexter's failure to pay for the fasteners. To the contrary, Long's deposition testimony shows that he had personal knowledge of the statements in his affidavit. For instance, Long testified that he spoke with Risdon, Dexter's vice president of procurement, about the delivery and Dexter's failure to pay. (Dkt. 119 ¶ 37; Dkt. 115-1 at 98–99); *see Cocroft*, 796 F.3d at 686. Nor does Dexter cite any authority suggesting that affidavits or deposition testimony require further documentary support to establish a material fact at summary judgment.

Also unconvincing is Dexter's argument that Aion has failed to comply with Rule 56 and Local Rule 56.1 by citing its Second Amended Complaint in its statement of material facts. (Dkt. 110 at 7–9). Local Rule 56.1 requires that a summary judgment movant file and serve a "statement

---

[12] Dexter has bones to pick with additional affidavits and deposition testimony that Aion relies on. (Dkt. 110 at 5–7). Resolving these disputes is unnecessary since Long's affidavit and testimony are sufficient to establish the material facts that FDL delivered $114,935.81 worth of fasteners to Dexter, and Dexter never paid for those fasteners—facts which Dexter has failed to contradict.

of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." L.R. 56.1(a)(3). "[T]he district court must apply Rule 56.1 in the specific context of the litigation before it and determine whether the submission at issue adequately complies with the purpose and intent of the Rule or impedes the Rule's effectiveness." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

Of course, "[c]itations to the complaint do little, if anything, to show the absence of any genuine issue of material fact." *Baldonado v. Wyeth*, 2012 WL 729228, at *2 (N.D. Ill. Mar. 6, 2012) (citing *Cracco*, 559 F.3d at 632, and *Tages v. Univision Tele. Grp., Inc.*, 2005 WL 276997, at *1 n.1 (N.D. Ill. Oct. 20, 2005)). In *Baldonado v. Wyeth*, the plaintiff's 56.1 statement included "eleven one-sentence paragraphs, almost all of which cite[d] exclusively to the complaint." 2012 WL 729228, at *2. Since the plaintiff "neither cite[d] nor refer[red] to any facts outside the pleadings," the court found that the 56.1 statement frustrated its efforts to resolve the motion. *Baldonado*, 2012 WL 729228, at *2. Similarly, in *Tages v. Univision Television Grp.*, the plaintiff's statements of fact were lacking because they "merely repeat[ed] the exact allegations of the complaint without citing additional support in the record." 2005 WL 2736997, at *3. Unlike in *Baldonado* and *Tages*, however, Aion has not relied solely on citations to its Second Amended Complaint. Although Aion has cited to its complaint to support some facts—many of which Dexter does not dispute[13]—Aion has supported the material facts underlying its motion for summary judgment with documentary evidence of the contract at issue, deposition testimony, and affidavits.[14]

---

[13] These facts include the parties' identities and locations (Dkt. 111 ¶¶ 1–7, 17, 36–38); that FDL has sold some inventory since this litigation began, (*id.* at ¶¶ 17, 22); that Dexter acknowledged FDL's assignment to P2Binvestor by making payments to P2Binvestor, (*id.* at ¶ 26); that Dexter refused to pay P2Binvestor $857,951.08, (*id.* at ¶ 29); and that Dexter did not respond to P2Binvestor's demand letters, (*id.* at ¶¶ 30, 35).

[14] Dexter is correct that Local Rule 56.1 asks movants to limit 56.1 statements to material facts. (*See* Dkt. 110 at 8 (citing *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)). Yet, to the extent Aion has provided immaterial

Since Dexter has not produced any evidence contradicting Long's affidavit and deposition testimony, the Court accepts Long's sworn statements as true. *See, e.g.*, *Opp. v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) (accepting statements in an affidavit as true "[b]ecause the record provides no counter-affidavits"). Aion has also pointed to two invoices totaling the disputed amount, (Dkt. 101-1 at 89–92), which Dexter acknowledges support an inference that the fasteners at issue were "manufactured and ready for shipment." (Dkt. 110 at 4–5). In sum, Aion has produced enough evidence to show that Dexter accepted from FDL and did not pay for fasteners totaling $114,935.81 in October 2018—before the October 31, 2018 delivery deadline for parts under Purchase Order 36641. Dexter has failed to refute this evidence. Accordingly, the undisputed material facts entitle Aion to judgment as a matter of law on its breach-of-contract claim with respect to $114,935.81 worth of parts.[15] Aion's partial motion for summary judgment is granted.

### B. Dexter's Motion

Dexter argues that it rightfully canceled its contract with FDL and so is not liable for refusing delivery of any shipments under Purchase Order 36641 that arrived after the October 31, 2018 deadline. (Dkt. 102 at 3–12). Indiana law gives effect to unambiguous cancellation clauses— even broad ones. *See Lawson*, 791 F.3d at 762; *e.g.*, *Nibco v. Arthur J. Gallagher Risk Mgmt. Servs., Inc.*, 2016 WL 1222217, at *8 (N.D. Ind. Mar. 29, 2016) (enforcing a clause allowing termination "at any time"); *Commc'ns Maint., Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1210 (7th Cir. 1985) (holding a clause allowing termination "with or without cause, upon thirty days written notice to the other party" was effective under Indiana law).

---

statements of fact, it has not "impede[d] the Rule's effectiveness" by doing so. *See Cracco*, 559 F.3d at 632. Nor does Aion's noncompliance provide cause for denying its motion.

[15] The Court does not reach Aion's alternative argument that Dexter was unjustly enriched by accepting and not paying for the parts. (Dkt. 106 at 7–8).

The terms and conditions of Purchase Order 36641 allowed Dexter to cancel "all or any part of a purchase order without payment or further liability if:" (1) Dexter breached "any of the terms of this Agreement"; (2) Dexter did "not make deliveries as specified in the schedules"; or (3) in Dexter's "reasonable discretion it determine[d] that delivery in accordance with the delivery schedules [was] endangered." (Dkt. 114 ¶ 17; Dkt. 102-8 at 42). Dexter invoked the cancellation provision on September 14, 2018, giving FDL forty-seven days' notice, which was reasonable. *See Rockwell Eng'g Co. v. Automatic Timing & Controls Co.*, 559 F.2d 460, 461–62 (7th Cir. 1977) (upholding thirty days' notice of termination as reasonable under Indiana law).

Aion contends that the contract's possible incorporation of the addendum or Sales Order 14154 are material disputed facts precluding summary judgment. (Dkt. 113 at 6–9). But assuming Sales Order 14154 is part of the contract, the provision that "[d]elivery is an estimate" would not supplant the cancellation clause under the terms and conditions of Purchase Order 36641. (Dkt. 102-8 at 60); *see, e.g.*, *Lawson* 791 F.3d at 762 (holding that, when "[r]ead holistically and harmonized," a provision that an incentive plan "would remain in effect until a subsequent plan, or amendment to the Plan, becomes effective" was "not in tension" with a provision setting an explicit termination date). Reading these provisions holistically, the original delivery date being an estimate does not undermine Dexter's clear cancellation right.

Whether the original delivery deadline was firm or an estimate, Aion does not dispute that after Long requested an additional 60 days from the original deadline, there was mutual assent to a delivery date of September 29, 2018. By the time FDL had missed the September deadline, and Dexter had granted a further extension until October 31, 2018, Dexter was within its reasonable discretion under the cancellation clause to determine that FDL's "delivery in accordance with the delivery schedules [was] endangered." (Dkt. 102-8 at 42). Dexter's cancellation of any shipments

that did not arrive by October 31, 2018 was effective, and its refusal to accept any shipments after that date was not a breach.

Aion argues that FDL failed to timely deliver due to (1) Dexter's failure to provide delivery instructions; and (2) import tariffs. (Dkt. 113 at 9–14). Both arguments are unconvincing. First, Aion does not dispute that, under Purchase Order 36641, the place of delivery was Dexter's supplier, Bossard, except for products that Dexter directed FDL to ship to its plants or scrap. Aion further agrees that Broadstreet instructed Long to scrap certain parts on May 29, 2018 and to ship certain other parts to Dexter's plants on July 31, 2018. Nonetheless, Aion argues that Broadstreet failed to provide "authority" or "disposition" until later, purportedly preventing FDL from timely shipping the products. Aion does not point to any term under the contract requiring Dexter to give additional authority or disposition beyond the shipping instructions that Broadstreet provided. Rather, email threads show that Long and others at FDL repeatedly asked Broadstreet for shipping instructions as to the same parts—after Broadstreet had given the instructions.

Aion also relies on Borgman's testimony attributing delays to unclear or inconsistent shipping instructions. But Aion has not pointed to any specific instances in which Broadstreet's instructions were unclear or inconsistent. From the record, it appears that Broadstreet provided complete shipping instructions, according to the contract, by July 31, 2018. For clarity, Broadstreet repeated those instructions in response to FDL's requests. Thus, Borgman's vague testimony does not create a triable issue of material fact on the issue of Broadstreet's shipping instructions.

Second, Aion leans on Long's testimony that delays were due to import tariffs. Yet, Aion does not dispute that Purchase Order 36641's terms and conditions required FDL to "immediately notify [Dexter] of the cause and duration of the anticipated delay" if it "at any time ha[d] reason to believe that deliveries" would be late. (Dkt. 114 ¶ 20; Dkt. 102-8 at 42). And Aion has not

pointed to any evidence that FDL notified Dexter of tariff-related delays. To the contrary, in November 2018, Long described FDL's delivery of the products as "lightning fast"—casting no blame on tariffs. (Dkt. 102-8 at 16). Long's testimony about tariffs cannot support a reasonable jury finding that Dexter's cancellation was a breach.

In sum, the contract allowed Dexter to cancel shipments that did not arrive by the extended delivery deadline. Dexter did not breach the contract by doing so. Thus, Dexter is entitled to summary judgment on Aion's breach-of-contract claim, except with respect to the $114,935.81 worth of timely delivered parts, which is the subject of Aion's partial motion for summary judgment. Since Aion's unjust enrichment claim depends on the same theory of liability as the breach-of-contract claim—that Dexter allegedly refused shipment without cause—the unjust enrichment claim also fails.

## III.     Promissory Estoppel (Count II)

Dexter is also entitled to summary judgment on Aion's alternative claim of promissory estoppel. A promissory estoppel claim cannot succeed under Indiana law where there is a valid contract. *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 703 (7th Cir. 2004) ("[I]t is precisely under such circumstances, where a promise is made but which is not enforceable as a 'contract,' that the doctrine of promissory estoppel is recognized." (quoting *First Nat'l Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949, 955 (Ind. 1991))); *Neurology & Pain Mgmt. Assocs., P.C. v. Bunin*, 2021 WL 230275, at *17 (N.D. Ind. Jan. 22, 2021) ("Promissory estoppel permits recovery where no contract in fact exists." (quoting *Hinkel v. Sataria Distrib. & Packaging, Inc.*, 920 N.E.2d 766, 771 (Ind. Ct. App. 2010))); *see also, e.g.*, *SMC Corp. v. Peoplesoft U.S.A., Inc.*, 2006 WL 8459569, at *5 (S.D. Ind. Jan. 20, 2006) (granting summary judgment on a promissory estoppel claim where the plaintiff admitted that a valid contract existed).

23

Thus, Aion's admission that a valid contract existed between Dexter and FDL makes promissory estoppel an improper vehicle.

## **CONCLUSION**

For the reasons above, Aion's motion for partial summary judgment is granted as to Count I in the amount of $114,935.81. (Dkt. 103). Dexter's motion for summary judgment is granted in part and denied in part: the motion is granted on all counts except with respect to Aion's claim for $114,935.81. (Dkt. 107).


Virginia M. Kendall
United States District Judge

Date: March 31, 2023